UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
INEZ BETHEA,

                              Plaintiff,

                    - against -

JP MORGAN CHASE & CO., JP MORGAN
CHASE BANK NA, MANNY MAYSONET,
JOHN WOLF, and COLLEEN M. CANNY,

                              Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
15-CV-3544 (PKC) (RML)

PAMELA K. CHEN, United States District Judge:

Plaintiff Inez Bethea brings this action against Defendants JP Morgan Chase & Co. and JP Morgan Chase Bank N.A. (collectively, "Chase"), Manny Maysonet, John Wolf, and Colleen M. Canny. She advances discrimination, hostile work environment, and retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 296 *et seq.*, and New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–107(1)(a), (7). Defendants move for summary judgment on all of Plaintiff's claims. For the following reasons, the Court grants Defendant's motion for summary judgment in its entirety.

## BACKGROUND

### I.      Plaintiff's 56.1 Statement and Supporting Evidence

The Eastern District of New York's Local Rule 56.1(b) requires that "[t]he papers opposing a motion for summary judgment . . . include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional

paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." E.D.N.Y. Local Rule 56.1(b). Here, Plaintiff did not provide such a statement. Instead, she submitted a statement containing "undisputed material facts" providing her own account of the events at issue. (*See generally* Plaintiff's Undisputed Material Facts ("Pl.'s Facts"), Dkt. 77-1.) However, she does not specifically respond to the facts asserted by Defendants. (*See generally id.*) Local Rule 56.1(c) notes that "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." E.D.N.Y. Local Rule 56.1(c); *see also Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 12, 2012) ("Eastern District Local Rule 56.1 requires . . . that disputed facts *be specifically* controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything.") (emphasis in original).

"A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). Here, the Court deems the facts stated in Defendants' 56.1 statement to be admitted based on Plaintiff's failure to comply with this district's local rules requiring her to specifically respond to each of Defendants' 56.1 statements of fact.[1] *See Russell v. Aid to Developmentally Disabled, Inc.*, 753

---

[1] The Court further notes that it has conducted an independent review of the evidence provided by both parties and finds that even if it were to consider Plaintiff's Undisputed Material Facts as a 56.1 statement controverting the assertions made by Defendants, its conclusions about Plaintiff's claims and the insufficiency of admissible evidence to support them would not change.

F. App'x 9, 13 (2d Cir. 2018) (summary order) (noting that in a case with "extensive filings and voluminous exhibits" and "where the court conducted at least some scrutiny of the record independent of [the party's] Local Rule 56.1 statement," "the district court did not abuse its discretion in requiring compliance with the Local Rule and crediting as undisputed those facts that [the plaintiff] did not properly controvert in her opposition"); *Alleyne v. Scherveer Nursing Care Ctr.*, No. 13-CV-3072 (SLT) (CLP), 2017 WL 4358729, at *2 (E.D.N.Y. Sept. 29, 2017) ("Thus, where cited evidence supports facts contained in defendants' Rule 56.1 statement and plaintiff disputes those facts without citing conflicting evidence, the Court deems the facts asserted in defendants' statement true.").

Defendants also assert that Plaintiff has submitted evidence[2] in support of her opposition to Defendants' motion for summary judgment that was not produced in discovery. (Defendants' Reply ("Defs.' R."), Dkt. 79, at 3–4.) Federal Rule of Civil Procedure 37 provides that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion . . . unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1).

> In considering whether a discovery sanction is appropriate, the Court must consider [(1)] "the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the excluded evidence; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new evidence; and (4) the possibility of a continuance."

*Mantel v. Microsoft Corp.*, No. 16-CV-5277 (AJN), 2018 WL 1602863, at *4 (S.D.N.Y. Mar. 29, 2018) (quoting *Design Strategy Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006)) (internal alterations omitted). Here, Plaintiff does not contest Defendants' representation that the

---

[2] Specifically, Defendants assert that Plaintiff's exhibits filed as Dockets 76-2, 77-6, 77-15, 77-50, 77-51, 77-52, 77-53, and 77-58 were not provided in discovery. Defendants include a declaration by their attorney stating that Defendants, at the beginning of the discovery process, requested these documents. (*See* Reply Declaration of Jade M. Gilstrap, Dkt. 79-1, ¶¶ 2–3.)

documents at issue were not provided to them in discovery, nor does Plaintiff provide a reason for her failure to produce the documents. Furthermore, the Court has reviewed the documents at issue and finds that they would not alter the Court's conclusions about Plaintiff's claims. Accordingly, the Court will not consider the documents at issue in analyzing Plaintiff's claims for purposes of Defendants' summary judgment motion. *See Mantel*, 2018 WL 1602863, at *4 ("[T]he Court concludes that it is appropriate in this case to prevent the [p]laintiff from supplementing the factual record on this motion for summary judgment with information and material that was withheld during the course of discovery."); *see also Landau v. Spenuzza, Inc.*, No. 04-CV-5504 (SLT) (VVP), 2009 WL 910367, at *4 (E.D.N.Y. Mar. 31, 2009) (declining to consider an expert's affidavit because parties had not disclosed the expert during discovery and noting that "Rule 37(c)(1) was designed to prevent the 'sandbagging' of adverse parties").

## II.     Relevant Facts[3]

Plaintiff is an African-American female born on August 25, 1964. (Defendant's 56.1 ("Defs.' 56.1"), Dkt. 78-9, ¶ 1.) She began her employment with Chase in May 1999 as a customer service representative. (*Id.* ¶ 2.) After an accident in September 2007, Plaintiff asked for and was granted various disability accommodations, including restrictions on "lifting, pushing, pulling anything over ten pounds" and permitting Plaintiff to "sit for at least eight hours and avoid constant up and down movement." (Plaintiff's Affidavit ("Pl.'s Aff."),[4] Dkt. 76, ¶ 7.) Beginning in

---

[3] As discussed *supra*, the Court deems the facts in Defendants' 56.1 statement, when supported by admissible evidence in the record, as undisputed. *See I.M. v. United States*, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) ("[D]istrict courts need only consider admissible evidence in ruling on a motion for summary judgment.") (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997)). Any citation to Defendants' 56.1 statement incorporates by reference the documents cited therein. When relevant, however, the Court may cite to the underlying document.

[4] Defendants also argue that Plaintiff's affidavit should be disregarded because it contains hearsay, *i.e.*, factual assertions that she does not have personal knowledge of, and makes

February 2010 until her termination on November 19, 2014, Plaintiff worked as an Assistant Branch Manager ("ABM") at the Foster Avenue branch in Brooklyn, New York. (Defs.' 56.1, Dkt. 78-9, ¶¶ 3, 63.) Beginning in June 2011, Plaintiff was supervised by Defendant Maysonet, the Branch Manager ("BM"). (*Id.* ¶ 4.) Defendant Wolf, the District Manager of the Brooklyn East District, supervised Maysonet. (*Id.* ¶ 5.)

In August 2011, Maysonet reported to Human Resources ("HR") that Plaintiff "was not appropriately counseling and guiding the Tellers on her team." (*Id.* ¶ 14.) Plaintiff was placed on a Performance Improvement Plan ("PIP") as a result. (*Id.*) In February 2012, Plaintiff was rated "Meets Expectations" on her annual review. (*Id.* ¶ 15.)[5] The review noted that "[Plaintiff] can benefit greatly by expanding her knowledge and comfort in delivering practices to increase teller referrals and sales. We would also look for a significant reduction in policy violation losses by staff." (2011 Year End Performance Review, Dkt. 78-2, at 3; *see also id.* (noting that Chase "would like to see more show coaching and hands on execution of behaviors that will grow referral numbers on a consistent basis").) Though Plaintiff was coached through the first half of 2012, in June 2012 Maysonet again reported to HR that Plaintiff was still not performing well. (Defs.' 56.1, Dkt 78-9, ¶¶ 16–17.) Specifically, Maysonet stated that "Plaintiff resented having to assist on the Teller line at times when the Branch became extremely busy" and that she "did not receive coaching and counseling well." (*Id.* ¶ 17.)

---

inappropriate legal conclusions. (Defs.' R., Dkt. 79, at 4–5.) The Court agrees, and considers only those portions of Plaintiff's affidavit that provide information that Plaintiff has personal knowledge of or that is otherwise competent evidence.

[5] However, at the same time, the Foster Avenue Branch received a 2011 year-end customer service award. (Plaintiff's Exhibit ("Pl.'s Ex.") 2, Dkt. 77-5.)

On July 20, 2012, both Maysonet and Plaintiff received an anonymously written letter criticizing Maysonet's managerial style and practices. (*Id.* ¶¶ 19–20.) Plaintiff shared the letter with Maysonet's supervisors, including Wolf. (*Id.* ¶ 20; Deposition of Inez Bethea ("Pl.'s Dep."), Dkt. 78-3, 128:17–18.) The letter stated that "[m]any female customers have complained that [Maysonet] speaks to them in a chauvinistic manner and they are uncomfortable dealing with him on further issues. Some female employees have also experienced inappropriate language from [Maysonet] including him telling one he would 'spank her.'" (July 2012 letter, Dkt. 78-8, at ECF[6] 18.) HR was informed of the letter and, in August 2012, interviewed several employees from the Foster Avenue branch including Plaintiff. (Defs.' 56.1, Dkt. 78-9, ¶¶ 21–22.) None of the interviewed employees stated that Maysonet engaged in discriminatory behavior. (*Id.* ¶ 21.) Plaintiff stated that while the way Maysonet speaks "can be demeaning/rough/strong yelling," she "doesn't agree that he's arrogant or chauvinistic[—]he treats everyone the same," and she "doesn't believe he has anything against women." (HR Records, Dkt. 78-8, at ECF 16.) In response to the HR investigation, Maysonet was placed on a PIP. (Defs.' 56.1, Dkt. 78-9, ¶ 23.)

Around the same time, in August 2012, Plaintiff received a mid-year review from Maysonet for January through June 2012 that rated her as "Low Meets Expectations." (*Id.* ¶ 18; Pl.'s Aff., Dkt. 76, ¶ 21.) When Plaintiff received her review, she believed that "Maysonet was retaliating against [her]" and went to her car, "where it is private," to report the retaliation to HR. (Pl.'s Aff., Dkt. 76, ¶ 22.) Maysonet saw Plaintiff leave, screamed at her, chased her to her car and "forcefully banged on [her] window" stating that he wanted to meet with her. (*Id.*)

---

[6] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

On November 1, 2012, in the aftermath of Hurricane Sandy, Plaintiff advised HR that though she was scheduled to work on Saturday, November 3, 2012, she had asked Maysonet if she could work at a branch closer to her home because she could not get gas for her car. (Defs.' 56.1, Dkt. 78-9, ¶ 26.) Plaintiff reported to HR that Maysonet had denied her request. (*Id.*) Maysonet also discussed Plaintiff's request with HR. (*Id.* ¶ 27.) He told HR that Plaintiff had acknowledged having a full tank of gas and that he told Plaintiff that he expected her to report to work at the Foster Avenue branch on November 3. (*Id.*) Maysonet also told HR that he could not work in Plaintiff's place that Saturday because he had worked the previous two Saturdays, only had a quarter of a tank of gas, and had not been able to assess the damage from the hurricane at his home in New Jersey. (*Id.*) Plaintiff continued to assert that she would be unable to work that Saturday via an email to Wolf. (*Id.* ¶ 28.) In response, Wolf provided information to Plaintiff about Chase's contingency plan to assist employees like Plaintiff affected by the hurricane, as well as information about car services Plaintiff could use to get to work. (*Id.* ¶¶ 29–30.)

On Friday, November 2, 2012, Plaintiff and Maysonet got into an argument at the Foster Avenue Branch about Plaintiff's ability to work the next day. (*Id.* ¶¶ 31–32.) Maysonet reported to HR that Plaintiff had attempted to speak to him, but that when Maysonet told Plaintiff he would speak with her after a meeting, Plaintiff "began yelling at Maysonet in front of employees and customers" and angrily left his office. (*Id.* ¶ 32.) Maysonet also reported that later that day, he told Plaintiff that her behavior about the Saturday shift was "unacceptable" and "suggested that she leave for the day if she could not control herself." (*Id.*) Plaintiff reported a different version of events. Specifically, she stated, in a text message to Wolf, that Maysonet heard Plaintiff and the staff talking, "assume[d] the staff & myself was talkin[g] about him & called me in the office & said I was relieved of my duties as an [assistant branch manager] & asked me to leave the Bank."

(Plaintiff's Texts to Wolf, Dkt. 78-5, at ECF 23.)  Wolf responded by informing Plaintiff that she had not been fired and that she should return to work the next day for her scheduled shift.  (Defs.' 56.1, Dkt 78-9, ¶ 34.)   An HR investigation into this incident found that both Maysonet and Plaintiff had raised their voices during the incident.  (Summary of Investigation, Dkt. 78-7, at ECF 38 (noting that "[HR] met with witnesses and confirmed that [Plaintiff], ABM and [Maysonet], BM voices were raised" and "[w]itnesses did not know whom [sic] raised th[eir] voice first"); *see also id.* (stating that [d]ue to [HR] confirming that both parties['] voices were raised[,] the Written Warning [against Plaintiff] will stand").)  As a result of this investigation, on November 9, 2012, Plaintiff received a Written Warning for "lack of leadership and failure to create a positive work environment for the employees of the Foster Avenue Branch."[7]  (Defs. 56.1, Dkt. 78-9, ¶¶ 35–36.) Plaintiff disputed the Written Warning with HR.  (*Id.* ¶ 37.)

On February 11, 2013, Plaintiff called HR stating that the situation with Maysonet was "getting worse."  (Pl.'s Ex. 37, Dkt. 77-38, at ECF 2; Pl.'s Ex. 38, Dkt. 77-39, at ECF 3.)  In the call, Plaintiff stated "that she now has rec[eived] a poor performance evaluation and [she] feels it is [because] [Maysonet] is taking things personally and retaliating with her."  (Pl.'s Ex. 37, Dkt. 77-38, at ECF 2.)  According to HR, Plaintiff also stated that "she is disabled and feels she is being discriminated against."  (*Id.*)   Internal HR records indicate that HR spoke with Plaintiff on February 13, 2013 regarding the outcome of her dispute of the November 2012 Written Warning. (Pl.'s Ex. 38, Dkt. 77-39, at ECF 2.)  During that conversation, HR also asked Plaintiff about her

---

[7] The record is unclear as to whether Maysonet also received a written warning for his role in this incident.  HR's investigation noted that Wolf "confirmed that he coached [Maysonet] regarding how he handled the situation [and] advised that within the next 30 days [Maysonet] will be transferred to another branch."  (Summary of Investigation, Dkt. 78-7, at ECF 38.)

February 11 phone call, but Plaintiff "stated she wished not to provide specifics at th[is] time." (*Id.*)[8]

On February 14, 2013, Plaintiff then received her year-end review for 2012. (Defs.' 56.1, Dkt. 78-9, ¶ 43; Pl.'s Dep., Dkt. 78-3, at 152:9.) In this review, she was rated as "Needs Improvement." (Defs.' 56.1, Dkt. 78-9, ¶ 43.) On the same day, Plaintiff also received a second Written Warning. (*Id.* ¶ 44.) The Written Warning listed examples of Plaintiff's poor performance, including

> her (1) failure to meet with Maysonet every morning and every afternoon for a daily brief and debrief, as instructed; (2) refusal of Maysonet's assistance with revisions to her branch action plan;[9] (3) ineffective coaching and supervision of her team; (4) failure to conduct customer exit interviews; and (5) refusal to assist customers at the Teller stations when demand so required.

(*Id.* ¶ 45.)

The same day, after receiving her annual review and second Written Warning, Plaintiff requested and was granted a paid medical leave of absence. (*Id.* ¶ 46.) Plaintiff remained on medical leave for approximately a month, until March 13, 2013.[10] (*Id.*) Upon her return, Plaintiff began reporting to a new Branch Manager, non-party Anibal Alvarado, Jr.[11] (*Id.* ¶ 47.) Alvarado

---

[8] The records also indicate that, on February 15, 2013, HR discussed with Maysonet Plaintiff's February 11 phone call. (Pl.'s Ex. 38, Dkt. 77-39, at ECF 2; Defs.' 56.1, Dkt. 78-9, ¶ 43; Pl.'s Dep., Dkt. 78-3, at 152:9.) During this conversation, Maysonet reported to HR that, the day before, he had rated Plaintiff as Needs Improvement on her 2012 annual performance review and had given her a written warning. (Pl.'s Ex. 38, Dkt. 77-39, at ECF 2.)

[9] In early January 2013, Wolf had instructed Plaintiff to create a Branch Action Plan in order to improve the performance of the Tellers who reported to her. (Defs.' 56.1, Dkt. 78-9, ¶ 42.)

[10] While on leave in March 2013, Plaintiff delivered to Defendants a demand letter outlining her discrimination allegations. (March 2013 Letter, Dkt. 78-7, at ECF 27–36.)

[11] Maysonet also went on medical leave from February 18, 2013 to July 8, 2013. (Defs.' 56.1, Dkt. 78-9, ¶ 48.) When he returned, he was first transferred to a new branch and ultimately was terminated on March 6, 2014. (*Id.*)

identified several problems with Plaintiff's performance at work and, as a result, in July 2013, rated Plaintiff as "Needs Improvement" at her mid-year review. (*Id.* ¶¶ 49–50.) At the same time, Plaintiff had requested and been granted a second medical leave of absence from May 20, 2013 to August 19, 2013. (*Id.* ¶ 51.) By July 17, 2013, Plaintiff had exhausted all of her protected FMLA intermittent leave, and on July 22, 2013, Alvarado contacted Plaintiff by phone to let her know that she had exhausted her FMLA leave and that her job would be posted internally. (*Id.* ¶¶ 52–53.) Plaintiff was eventually replaced by Beverly Lawrence, an African-American woman, who was 51-years-old at the time.[12] (Defs.' 56.1, Dkt. 78-9, ¶ 54.)

Through the rest of 2013, Plaintiff requested multiple extensions of her short-term disability leave that Chase granted. (*Id.* ¶¶ 55–57.) Chase ended Plaintiff's short-term disability leave of absence with paid benefits on November 17, 2013, but granted an additional twelve months of unpaid leave of absence.[13] (*Id.* ¶ 58.) Plaintiff also requested long-term disability leave with Chase's long-term disability plan administrator, Prudential Insurance Company of America. (*Id.* ¶ 59.) Plaintiff's claim was ultimately denied. (*Id.* ¶¶ 60–61.) In February 2014, Plaintiff applied for Social Security disability benefits. (*Id.* ¶ 67; *see also* Plaintiff's Social Security Application ("Pl.'s SSA App."), Dkt. 78-3, ECF 132–42.) In her application, Plaintiff stated that she was "unable to work because of [her] disabling condition on May 20, 2013." (Pl.'s SSA App., Dkt. 78-3, at ECF 132.)

---

[12] Plaintiff asserts, without any support, that she was replaced by Cathy Rodriguez, "a young Hispanic woman." (Pl.'s Facts, Dkt. 77-1, ¶ 118.)

[13] Plaintiff asserts that she was ready to return to work in August 2013, but that she was told that Foster Branch Avenue had no open ABM spots and that she would need to go on a 60-day job search. (Pl.'s Facts, Dkt. 77-1, ¶ 117; *see also* Pl.'s Ex. 62, Dkt. 77-63, at ECF 2.) However, the exhibit she cites in support of her statement notes that Plaintiff would have to go on a 60-day job search because "she does not want to come back to [F]oster and all other[] [ABM] openings have been filled." (Pl.'s Ex. 63, Dkt. 77-64, at ECF 2.)

On October 3, 2014, towards the end of Plaintiff's unpaid twelve-month leave of absence period, HR contacted Plaintiff to see whether she would be returning to work. (Defs.' 56.1, Dkt. 78-9, ¶ 62.) Plaintiff stated that she was not able to return to work. (*Id.*) Pursuant to Chase's Leave of Absence Policy, Plaintiff was ultimately terminated on November 19, 2014. (*Id.* ¶¶ 63–64.) Since her termination, Plaintiff has not applied for unemployment benefits because "she believed they were for someone who is ready, willing, and able to work and she wasn't able to work." (*Id.* ¶ 65 (internal quotations and citation omitted).) Plaintiff has also not sought any other employment. (*Id.* ¶ 66.)

## III.    Procedural History

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission on December 9, 2013 (*id.* ¶ 70) and then filed a Verified Complaint in Kings County Supreme Court on May 1, 2015 (*see* Notice of Removal, Dkt. 1, ¶ 1; *see also* Notice of Removal, Exhibit A, Dkt. 1). Defendants timely removed the complaint on June 17, 2015. (*See* Notice of Removal, Dkt. 1, ¶ 3.) After extensive discovery,[14] Defendants filed a motion for summary judgment on January 15, 2019. (Dkt. 78.)

### LEGAL STANDARD

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

---

[14] Parties litigated numerous discovery-related motions before Defendants moved for summary judgment. (*See, e.g.*, Dec. 5, 2016 Motion to Compel, Dkt. 28; Apr. 2, 2018 Motion for Discovery, Dkt. 57; May 9, 2018 Motion for Spoliation Sanctions, Dkt. 59.)

prevail as a matter of law").  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).  Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of N.Y.*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).  A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quotation omitted; alteration in original).  In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quotation omitted).

In determining whether a genuine issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  The Court also construes any disputed facts in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970).  However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48.

## DISCUSSION

### I.    Discrimination Claims

Plaintiff alleges discrimination based on (1) her race and gender in violation of Title VII, (2) her disability in violation of the ADA, and (3) her age in violation of the ADEA. (Plaintiff's Memorandum of Law ("Pl.'s Br."), Dkt. 75, ¶ 1.) Plaintiff's Title VII, ADA, and ADEA discrimination claims are all analyzed under the familiar three-part burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016).[15]

"Under *McDonnell Douglas*, a plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination[.]" *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 251 (2d Cir. 2014). A plaintiff's burden at this stage is "minimal." *Holcomb v. Iona College*, 521 F.3d 130, 139 (2d Cir. 2008) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993)). "[I]t is then the defendant's burden to proffer a legitimate non-discriminatory reason for its actions[.]" *Abrams*, 764 F.3d at 251. Defendants' burden "is not a particularly steep hurdle." *Hyek v. Field Support Servs.*, 702 F. Supp. 2d 84, 93 (E.D.N.Y.2010); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (noting that a defendant's burden "is one of production, not persuasion; it can involve no credibility assessment") (internal quotations and citation omitted). "[T]he final and ultimate burden is on the plaintiff to establish that the defendant's reason is in fact pretext for unlawful discrimination." *Abrams*, 764 F.3d at 251; *see also Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000) ("If such a reason

---

[15] This burden-shifting framework also applies to Plaintiff's state law discrimination claims, *see Esar v. JP Morgan Chase Bank N.A.*, No. 15-CV-382 (NGG) (PK), 2018 WL 2075421, at *6 (E.D.N.Y. May 3, 2018), but for the reasons discussed *infra*, the Court declines to exercise supplemental jurisdiction over these claims.

is proffered, the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action.").

## A.    *Prima Facie* Case

 "[A] plaintiff must first establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (internal quotation marks omitted); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010) ("In order to establish a prima facie case of age discrimination, [a plaintiff] must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination.").  The elements of an ADA discrimination claim vary slightly: "To establish a *prima facie* case of disability discrimination, Plaintiff must show that '[(1)] [her] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [s]he suffered adverse employment action because of [her] disability.'" *Abato v. N.Y.C. Off-Track Betting Corp.*, No. 03-CV-5849 (LTS) (HPB), 2007 WL 1659197, at *5 (S.D.N.Y. June 7, 2007) (quoting *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999)).

"Notably, the qualification prong under the ADA differs from the qualification prong under Title VII and the ADEA, in that the plaintiff must show under the ADA that [s]he is 'qualified to perform the essential functions of [her] job, *with or without reasonable accommodation*.'" *Kovaco*, 834 F.3d at 136 (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)).

The Court accordingly analyzes Plaintiff's claim under the ADA because it is the most favorable to Plaintiff and allows her to show that she was qualified for her position with reasonable accommodations.

Defendants do not dispute that Plaintiff was an African-American woman in her fifties (Defs.' 56.1, Dkt. 78-9, ¶ 1), and that she suffered an adverse employment action when she was terminated in November 2014 (*id.* ¶ 63). However, Defendants argue that Plaintiff nonetheless fails to establish a *prime facie* case of discrimination because she has not shown that she was qualified for her position, as defined under the ADA (or Title VII and the ADEA), at the time of termination, and she has failed to show that the circumstances surrounding her termination give rise to an inference of race, age, or disability discrimination. (Defendants' Memorandum of Law ("Defs.' Br."), Dkt. 78-10, at 5–10.)

### 1. Qualified for the Position

A "[p]laintiff's admission that she is unable to work—and, indeed, her failure to appear for work—prevent her from performing the essential functions of her job, and thereby preclude her from establishing a prima facie case of disability discrimination under the ADA." *Sesay-Harrell v. NYC Dep't of Homeless Servs.*, No. 12-CV-925 (KPF), 2013 WL 6244158, at *17 (S.D.N.Y. Dec. 2, 2013) (collecting cases). Plaintiff was terminated in November 2014. (Defs.' 56.1, Dkt. 78-9, ¶ 63.) By that date, Plaintiff had not attended work since May 20, 2013. (*Id.* ¶ 51.) Plaintiff also filed for Social Security disability benefits in February 2014, stating in her application that she was "unable to work because of [her] disabling condition on May 20, 2013."[16] (Pl.'s SSA

---

[16] Defendants argue that Plaintiff should be judicially estopped from arguing that she was qualified for her position at the time of her termination because "Plaintiff has represented to Chase, its long-term disability carrier, and the Social Security Administration that she is 'unable to work.'" (Defs.' Br., Dkt. 78-10, at 6 n.4.) The Court declines to find that Plaintiff is judicially estopped from making this argument because Defendants have not shown what specific factual

App., Dkt. 78-3, at ECF 132.)  Further, Plaintiff has admitted that she has not been able to work

since her termination in November 2014.  (*See* Pl.'s Dep., Dkt. 78-3, at 17:24–18:7 (stating that

she is not "currently physically able to work" because she "ha[s] some disabilities" including

"spinal stenosis [in her] back"); *see also id*. at 204:2–4 (stating that "[t]o my knowledge

[u]nemployment [benefits] [are] for someone who is ready, willing and able to work.  I wasn't able

to work [in November 2014]").)  Finally, Plaintiff has put forth no evidence that she would have

been able to work at any point after May 20, 2013 with a reasonable accommodation or that she

requested one after that date.  Therefore, Plaintiff is unable to establish this prong of her *prima*

*facie* case.

The Court finds Plaintiff's argument that she was ready to return to work in August 2013

(*see* Pl.'s Br., Dkt. 75, ¶ 47; Pl.'s Facts, Dkt. 77-1, ¶¶ 117–18) unavailing.  Plaintiff states that

when she told Defendants she was ready to come back to work, "she received no response from

[D]efendants."  (Pl.'s Br., Dkt. 75, ¶ 47.  *But see* Pl.'s Ex. 63, Dkt. 77-64, at ECF 2 (noting that

---

statements Plaintiff made in her SSA application that would be contradicted by an argument that
she was qualified for her position *with reasonable accommodations*.  *See Kovaco*, 834 F.3d at 137
("To establish judicial estoppel, a party 'must show that (1) the party against whom the estoppel
is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by
the first tribunal in some manner, such as by rendering a favorable judgment.'") (quoting *Robinson
v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015)).

However, for the reasons discussed herein, Plaintiff's admissions in the instant case are
sufficient for the Court to find that no reasonable jury could conclude that Plaintiff was qualified
for her position, with or without reasonable accommodation, at the time of her termination.  *See
Benjamin v. Health & Hosps. Corp.*, No. 07-CV-2487 (KAM) (LB), 2009 WL 2959622, at *9
(E.D.N.Y. Sept. 11, 2009), *aff'd*, 394 F. App'x 829 (2d Cir. 2010) (summary order) ("A plaintiff's
sworn assertion in an application for disability benefits that she is, for example, 'unable to work'
will appear to negate an essential element of her ADA case—at least if she does not offer a
sufficient explanation. . . .  [A]n ADA plaintiff cannot simply ignore the apparent contradiction
that arises out of the earlier [Social Security Disability Insurance] total disability claim.  Rather,
she must proffer a sufficient explanation.") (quoting *Cleveland v. Policy Mgt. Sys. Corp.*, 526 U.S.
795, 806 (1999)) (internal alterations omitted).

Defendants intended to tell Plaintiff that she would have to undergo a 60-day job search if she returned, as she did not want to return to the Foster Avenue Branch, and no other ABM positions were available).) Plaintiff asserts, without support, that, "[u]pon realizing Chase had no interest in taking her back from her [FMLA] leave, and realizing she was about to be fired, . . . [Plaintiff] became overly distressed and her heart condition was aggravated." (Pl.'s Facts, Dkt. 77-1, ¶ 118.) As a result, her doctor once again "put her on medical leave." (*Id.*) Plaintiff appears to argue that Defendants' purported role in her continued medical leave affects the analysis of whether Plaintiff was qualified for her position at the time of her termination. However, she cites no cases in support of this proposition. Therefore, even assuming *arguendo* that Plaintiff was able to return to work in August 2013, this does not change the Court's conclusion that, by November 2014, when Plaintiff was actually terminated, she had not shown that she was qualified for her position, even with accommodations. Rather, Plaintiff's own claim that her heart condition was aggravated after August 2013 further supports this conclusion. Accordingly, the Court finds that no reasonable jury could find that Plaintiff was qualified for her position, with or without accommodation, at the time of her termination and that Plaintiff therefore cannot establish a *prima facie* discrimination claim under the ADA, Title VII, or the ADEA.

### 2. Circumstances Giving Rise to an Inference of Discrimination

Plaintiff has also failed to show that the circumstances surrounding her termination give rise to an inference of discrimination.

> An inference of discrimination can be drawn from circumstances such as: "the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."

*Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625 (MKB), 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013) (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001)). Though "[n]o one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination," *Ofoedu v. St. Francis Hosp. & Med. Ctr.*, No. 04-CV-1707, 2006 WL 2642415, at *14 (D. Conn. Sept. 13, 2006), a plaintiff's "mere subjective belief that [s]he was discriminated against because of h[er] [protected characteristics] does not sustain a . . . discrimination claim,'" *Gue v. Suleiman*, No. 10-CV-8958, 2012 WL 4473283, at *8 (S.D.N.Y. Sept. 27, 2012).

Here, Plaintiff offers virtually no evidence from which to infer discrimination by Defendants. There is no evidence of disparate treatment: Plaintiff does not identify any employees outside of her asserted protected classes—*i.e.*, non-African-American, male, and/or non-disabled employees—who were similarly situated to Plaintiff—*i.e.*, did not return to work after being out on medical leave—and were not terminated. *See Russell v. Cty. of Nassau*, 696 F. Supp. 2d 213, 232 (E.D.N.Y. 2010) ("A Title VII plaintiff may establish an inference of discriminatory intent in a number of different ways depending on the specific facts of the case. For example, a discriminatory race and/or color motive can be inferred if a plaintiff was treated differently than similarly situated white employees . . . ."). Plaintiff's claim is further undermined by the fact that a 51-year-old, African-American woman replaced her. *See Hayes v. Cablevision Sys. N.Y.C. Corp.*, No. 07-CV-2438 (RRM), 2012 WL 1106850, at *13 (E.D.N.Y. Mar. 31, 2012) ("[T]he fact that plaintiff was replaced by a member of the same protected class weighs heavily against the inference of discrimination.") (internal quotations and citation omitted); *see also Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 117 (2d Cir. 2010) (summary order); *Moore*, 2013 WL 3968748, at *10.

In support of her claims, Plaintiff relies on a handful of statements over the course of three years by Maysonet and Wolf that she argues support an inference of discriminatory intent.  For example, she notes that in July 2012, anonymous employees from the Foster Avenue Branch provided a letter to Plaintiff and Maysonet, alleging, *inter alia*, that Maysonet "speaks to them in a chauvinistic manner and they are uncomfortable dealing with him on further issues." (July 2012 Letter, Dkt. 78-8, at ECF 18.)  Plaintiff also references a conversation between herself and Maysonet on January 3, 2013 where Maysonet justified giving an older employee a smaller bonus because "she was not doing as much work as the other employees and [she] always go[es] to the bathroom." (Pl.'s Ex. 8, Dkt. 77-11, at ECF 3.)  In response, Plaintiff stated that Maysonet's decision to give an older employee who needed to use the bathroom frequently a smaller bonus "was age discrimination[, and the] medical condition she had . . . should not be used to factor what a twenty year employee receives and [Maysonet] stated he wouldn[']t change it."[17]  (*Id.*)

However, Plaintiff does not proffer any bias-motivated remarks that were directed at her, or that were in any way connected to her termination.  *See Johnson v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 314, 325 (E.D.N.Y. 2014), *aff'd*, 633 F. App'x 42 (2d Cir. 2016) (summary order) (noting that an inference of discrimination was not warranted when the "[p]laintiff did not identify the

---

[17] In their Memorandum of Law, Defendants also note additional comments by Maysonet and Wolf. (Defs.' Br., Dkt. 78-10, at 15 (noting that Maysonet once stated to Plaintiff, in response to Plaintiff informing a customer that a manager could be a woman, that "He [the customer] said it right.  He, he.  The men are managers."); *see also id.* (noting that Maysonet once said, in response to Plaintiff's assertion that she found aspects of her job difficult, "that's why you got to hire younger people.  You know, they can do the job"); *see also id.* (noting that Wolf used the term "you people" and once said "I got to get out of here[.] [I]t is dark in Brooklyn, [and] I'm from Westchester").)  However, though the citations for these statements are to Plaintiff's deposition, Plaintiff does not provide the relevant pages of the deposition for the Court to review.  *Cf. Gallimore-Wright v. Long Island R. Co.*, 354 F. Supp. 2d 478, 488 (S.D.N.Y. 2005) ("Judges are not like pigs, hunting for truffles buried in the record.") (internal quotations and citations omitted).  Regardless, the Court does not find that these statements alter its conclusion about Plaintiff's claims.

statements as reflecting a discriminatory animus towards him"); *see also Boyce v. Bank of New York*, 226 F. App'x 17, 19 (2d Cir. 2006) (summary order). Stray remarks, on their own, are not enough to support an inference of discrimination, even for Plaintiff's *prime facie* case, where the burden is minimal. *See Abdu-Brisson*, 239 F.3d at 468 ("[I]t is true that the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination . . . ."); *Hayes*, 2012 WL 1106850, at *10 ("Stray remarks that are not related to [plaintiff]'s discharge or neutral remarks unrelated to her protected group status are insufficient to demonstrate that she was terminated for discriminatory reasons."); *see also Gobin v. N.Y.C. Health & Hosps. Corp.*, No. 04-CV-3207 (WHP), 2006 WL 2038621, at *6 (S.D.N.Y. July 19, 2006) ("Based on the evidence, the discriminatory statements were few and isolated and absent further indicia of discrimination, are insufficient to establish an inference of discrimination.") (collecting cases).

Plaintiff also appears to support her claim by stating that she subjectively felt discriminated against (*see* Pl.'s Facts, Dkt. 77-1, ¶ 58 (stating that "[a]s a Black woman, being spoken to in that tone by two men, it made her feel her opinions were worthless")), but "a plaintiff's mere subjective belief that [s]he was discriminated against because of [her protected characteristics] does not sustain a . . . discrimination claim," *Moore*, 2013 WL 3968748, at *6 (internal quotations and citation omitted). Similarly, Plaintiff's argument—unsupported by any competent evidence—that Wolf and Maysonet were the subject of several other discrimination claims is also insufficient. *Cf. Hayes*, 2012 WL 1106850, at *11 (finding that a plaintiff cannot rely on inadmissible hearsay statements when they are not supported by affidavits or deposition testimony to attribute discriminatory animus to a defendant).

Plaintiff's other arguments are all based on the events surrounding Plaintiff's negative evaluations and the incident between Plaintiff and Maysonet in the aftermath of Hurricane Sandy.

(*See* Pl.'s Br., Dkt. 75, ¶ 45.)  However, none of these incidents related to Plaintiff's various protected characteristics and therefore cannot be used as support to find an inference of discrimination.  *Cf. Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) ("Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.").  Nor were any of these incidents even remotely close in time, or shown to be otherwise related, to the only adverse action taken against Plaintiff, her termination.

In sum, the Court concludes that no reasonable jury could find that there was an inference of discrimination.

### B.      Pretext

Moreover, even assuming *arguendo*, that Plaintiff could establish a *prima facie* case, the Court finds that it still must grant Defendants' motion because Plaintiff has failed to sufficiently rebut Defendants' assertion that it terminated Plaintiff for a legitimate, non-discriminatory reason.

In response to Plaintiff's allegations, Defendants assert that Plaintiff was fired "[b]ased on her inability to return to work" (Defs.' 56.1, Dkt. 78-9, ¶ 63), pursuant to Chase's Leave of Absence Policy, which states that "if an employee's claim for long-term disability ('LTD') coverage is denied and the employee is unable to report to work, then the employee's employment may be terminated if additional unpaid leave is not reasonable under the circumstances" (*id.* ¶ 64; *see also* Defs.' Br., Dkt. 78-10, at 10).  The undisputed facts demonstrate that Plaintiff's situation at the time Chase ultimately terminated her: she had been denied LTD and was unable to report to work (by her own admission), and she had already received a year's worth of unpaid leave, making additional unpaid leave unreasonable under the circumstances.  (Defs.' 56.1 Dkt. 78-9, ¶¶ 46, 51–

52, 55–63.) Therefore, Defendants have satisfied their *McDonnell Douglas* burden by providing a legitimate, non-discriminatory reason for Plaintiff's termination. *Abrams*, 764 F.3d at 251; *see also Alleyne*, 2017 WL 4358729, at *10 ("At the second step of the *McDonnell Douglas* framework, any such stated purpose is sufficient to satisfy the defendant's burden of production; the employer does not have to persuade the court that the stated purpose was the actual reason for its decision.") (internal quotations and citations omitted).

Pursuant to the *McDonnell Douglas* framework, in order to survive summary judgment, Plaintiff must provide evidence that Defendants' stated reason is a "pretext" and that Defendant's true motivation was discrimination. *See Abrams*, 764 F.3d at 251; *see also Graham*, 230 F.3d at 38. Plaintiff is unable to do so. She argues that "Defendants' non-discriminatory reason for terminating [P]laintiff is pretext" because Defendants did not respond to Plaintiff when she reached out stating that she was able to return to work in August 2013. (Pl.'s Br., Dkt. 75, ¶ 47.) Therefore, she argues, "[i]t was [D]efendants . . . who prevented [P]laintiff from returning to work." (*Id.*) First, as previously noted, given that Plaintiff was terminated in November 2014, Defendants' conduct more than a year earlier does not support a finding of pretext. *See Galimore v. City Univ. of N.Y. Bronx Cmty. Coll.*, 641 F. Supp. 2d 269, 286 (S.D.N.Y. 2009) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.") (internal quotations and citation omitted). Furthermore, Plaintiff does not cite to any evidence suggesting that Defendants, in terminating Plaintiff, failed to follow the company's policy and rules governing termination after extended medical leave. *See Feingold v. New York*, 366 F.3d 138, 156 (2d Cir. 2004) (finding that defendants' proffered reason for termination was pretextual when plaintiff provided evidence showing that "other [employees] were not reprimanded or disciplined for

similar mistakes").  Furthermore, even if Plaintiff could show that Defendants did not follow their own policy regarding termination, that would still be insufficient to establish pretext unless Plaintiff could also provide evidence to show that discrimination played a role in Defendants' actions.  *See Miller v. Nat'l Assoc. of Sec. Dealers, Inc.*, 703 F. Supp. 2d 230, 247 (E.D.N.Y. 2010) ("The relevant inquiry is not whether the performance-based justification for plaintiff's termination articulated by defendant is accurate or fair, but whether plaintiff can show any evidence that it was not the actual justification.  Plaintiff cannot accomplish this by stating his disagreement with his supervisors' negative assessment of his performance, even if he has evidence that the decision was objectively incorrect.") (internal quotations, alterations, and citations omitted); *Kennedy v. Related Mgmt.*, 403 F. App'x 566, 568 (2d Cir. 2010) (summary order) ("[E]ven if we were to assume that [the defendant's] asserted reason [for rejecting the plaintiff's application] was pretextual, there is no evidence in the record from which a reasonable jury could find that it was a pretext to hide a discriminatory motive."); *see also Moore*, 2013 WL 3968748, at *12 (collecting cases).  Plaintiff has failed to provide any evidence that suggests Defendants' proffered reason for her termination is pretextual.  Accordingly, Plaintiff's discrimination claims fail.

*       *       *

For all of these reasons, the Court grants Defendants' motion for summary judgment as to Plaintiff's claims of discrimination in violation of Title VII, the ADA, and the ADEA.

## II.     Hostile Work Environment Claims

"To establish a hostile work environment claim under the Title VII framework, a plaintiff must show that the 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create

an abusive working environment.'" *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (quoting

*Harris v. Forklift Sys.*, *Inc.*, 510 U.S. 17, 21 (1993)).[18] "In considering whether a plaintiff has met

this burden, courts should examine the totality of the circumstances, including: the frequency of

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

mere offensive utterance; and whether it unreasonably interferes with the victim's job

performance." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014)

(internal quotations, alterations, and citation omitted). "This standard has both objective and

subjective components: the conduct complained of must be severe or pervasive enough that a

reasonable person would find it hostile or abusive, and the victim must subjectively perceive the

work environment to be abusive." *Raspardo*, 770 F.3d at 114 (citing *Harris*, 510 U.S. at 21–22).

"Of course, it is axiomatic that mistreatment at work, whether through subjection to a hostile

environment or through other means, is actionable . . . only when it occurs because of an

employee's protected characteristic . . . ." *Rivera*, 743 F.3d at 20 (internal quotations, alterations,

and citation omitted).

Plaintiff argues that her hostile work environment claim is predicated on being "fired

wrongfully before customers and staff" and being "given two written warnings back to back, one

in the presence of her workers that [Defendants'] own HR [office] found to be unsupported by the

evidence."[19] (Pl.'s Br., Dkt. 75, ¶ 50.) However, assessing "the totality of the circumstances,"

---

[18] Hostile work environment claims under the ADA and ADEA are evaluated under the same standards. *See Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (ADEA); *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (ADA).

[19] The Court notes that, though Plaintiff does not raise it here, the comments made by Wolf and Maysonet could be used to argue a hostile work environment claim. *See infra* at n.17. However, "'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of unemployment.'" *Ashok v. Barnhart*, 289 F. Supp. 2d 305, 312 (E.D.N.Y. 2003) (quoting *Faragher v. City of Boca Raton*,

*Rivera*, 743 F.3d at 20, the Court finds that Plaintiff cannot establish a hostile work environment claim. "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano*, 294 F.3d at 374 (internal quotations and citation omitted). "Isolated incidents generally will not suffice to establish a hostile work environment unless they are extraordinarily severe." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010).

Here, none of the incidents Plaintiff refers to, on their own, are serious enough to meet the threshold for a hostile work environment claim. *See Hahn v. Bank of Am. Inc.*, No. 12-CV-4151 (DF), 2014 WL 1285421, at *23 (S.D.N.Y. Mar. 31, 2014) (noting that any one individual incident where plaintiff was embarrassed or yelled at were not sufficiently serious to support a hostile work environment claim on its own); *cf. Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (finding a "single incident of verbal harassment" sufficient to establish a hostile work environment claim when the statement was sexually explicit, challenged the fire-fighter-plaintiff's professional competence, was witnessed by a large group of employees that included her subordinates, and created a fear that that she would be in danger at future fire scenes). And taken together, the incidents are not enough to be sufficiently continuous or concerted, especially since they occurred over the course of several months. *See Hahn*, 2014 WL 1285421, at *23 (finding a plaintiff's evidence of a hostile work environment claim was insufficient when it consisted of "a few incidents where [the defendant] allegedly made comments that embarrassed [the p]laintiff or yelled

---

524 U.S. 775, 788 (1998)); *see also Shih v. City of New York*, No. 03-CV-8279 (LAP), 2006 WL 2789986, at *6 (S.D.N.Y. Sept. 28, 2006) ("Only two comments were actually discernibly age-based and they were not 'particularly severe or degrading.'") (quoting *Crawford v. Medina General Hosp.*, 96 F.3d 830, 836 (6th Cir. 1996) (holding that the employer's statements that "old people should be seen and not heard" and "I don't think women over 55 should be working" were not particularly severe or degrading)). Applying these standards, the Court does not find that the statements made by Maysonet and Wolf are enough to establish a hostile work environment claim.

or screamed at her" over the course of three months); *see also Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (citing, *inter alia*, *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987) ("Because the claimed incidents in the instant case were few in number and occurred over a short period of time, they fail to allege a racially hostile working environment."). Finally, the type of conduct that Plaintiff asserts Defendants engaged in, *i.e.*, actions focused on Plaintiff's work performance, does not support a hostile work environment claim. *See Salerno v. Town of Bedford, NY*, No. 05-CV-7293 (SCR), 2008 WL 5101185, at *8 (S.D.N.Y. Dec. 3, 2008) ("Allegations of negative job evaluations or excessive reprimands are insufficient to establish a hostile environment claim."). Given that Plaintiff is unable to show that Defendants' conduct was sufficiently severe or pervasive to alter the conditions of her employment, Plaintiff's hostile work environment claim fails.

Accordingly, the Court grants Defendants' motion for summary judgment on Plaintiff's hostile work environment claims.

## III. Retaliation Claims

"Retaliation under Title VII is also measured under the three-step *McDonnell Douglas* analysis." *Abrams*, 764 F.3d at 254. "To make out a prima facie case of retaliation, a plaintiff must make four showings: that (1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity."[20] *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (internal quotations and citation omitted). "[T]he plaintiff need not prove that her underlying complaint of discrimination had merit." *Lore v. City*

---

[20] The same standard applies to retaliation claims under the ADA and ADEA. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (ADA); *Gorzynski*, 596 F.3d at 110 (ADEA).

*of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). "The burden at the summary judgment stage for Plaintiff is minimal . . . and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 221 (E.D.N.Y. 2014) (internal quotations and citations omitted).

A.    ***Prime Facie* Case**

1.    Protected Activity and Defendants' Knowledge

"[P]rotected activity includes both 'opposing discrimination proscribed by the statute and . . . participating in [employment discrimination] proceedings.'" *Moore*, 2013 WL 3968748, at *15 (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). "The complaint can be informal—an employee does not need to lodge a formal complaint of discrimination." *Bowen-Hooks*, 13 F. Supp. 3d at 222; *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) ("While the law is clear that opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection, this notion of opposition includes activities such as making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.") (internal quotations, alterations, and citation omitted). "However, while such complaints may be informal, they cannot be so vague or 'generalized' that the employer could not 'reasonably have understood that the plaintiff's complaint was directed at conduct prohibited by Title VII.'" *Bowen-Hooks*, 13 F. Supp. 3d at 222 (quoting *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011)) (alteration omitted); *see also Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 280 (E.D.N.Y. 2013) ("When making the complaint, a plaintiff must do so in sufficiently specific terms so that

the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race, gender, or national origin.") (internal quotations and citation omitted).

Plaintiff argues that she engaged in protected activity through her "complaints, her filing of a staff letter containing complaints to her District Manager and Chase's Human Resources Department[,] and her filing an EEOC Intake Questionnaire."  (Pl.'s Br., Dkt. 75, ¶ 11.) Specifically, she appears to assert the following activities as protected: (1) providing a copy of the July 2012 letter about Maysonet that Plaintiff found to Wolf and Chase's HR Department; (2) providing a demand letter to Chase through her attorneys in March 2013 "outlining [her] charges of discrimination" (*id.* ¶ 14); and (3) filing her claim with the EEOC in December 2013.[21]  (*Id.* ¶¶ 12–14.)  Though the latter two acts constituted protected activities of which Defendants were aware, Plaintiff cannot show the same with respect to the July 2012 letter about Maysonet.  First, Plaintiff does not suggest that she wrote the letter, she only asserts that she found a copy of it on her desk and passed it along to Wolf and HR.  (Defs.' 56.1, Dkt. 78-9, ¶ 20; Pl.'s Dep., Dkt. 78-3, 128:17–18.)  Given Plaintiff's role as an assistant branch manager, this is not protected activity. *See Sank v. City Univ. of N.Y.*, No. 10-CV-4975, 2011 WL 5120668, at *10 (S.D.N.Y. Oct. 28, 2011) ("[A]n employee . . . reporting complaints of alleged misconduct pursuant to her official

---

[21] Plaintiff also appears to assert that her complaints in November 2012, after the incident with Maysonet in the aftermath of Hurricane Sandy, were protected activity.  (*See* Pl.'s Br., Dkt. 75, ¶ 14.)  However, since these complaints did not include any mention of discrimination on the basis of any of Plaintiff's protected characteristics, they are not protected activity under the relevant retaliation statutes. *See Moncrief v. N.Y. Pub. Library*, 343 F. App'x 627, 629 (2d Cir. 2009) (summary order) (noting that "because [a plaintiff]'s 2002 email—the basis of her retaliation claim—made no mention of racial discrimination, the district court correctly determined that she never participated in a protected activity, and therefore, her retaliation claim failed as a matter of law"); *Newsome v. IDB Capital Corp.*, No. 13-CV-6576 (VEC), 2016 WL 1254393, at *25 (S.D.N.Y. Mar. 28, 2016) ("General allegations of mistreatment do not constitute protected activity.") (citing *Drumm v. SUNY Geneseo Coll.*, 486 F. App'x 912, 914 (2d Cir. 2012) (summary order)).

duties is not engaged in inherently oppositional activity."). Moreover, given that Plaintiff stated to HR that she did not agree with the contents of the letter (*see* HR Records, Dkt. 78-8, at ECF 16), there is no way for Defendants to have known that she was engaging in protected activity. *See Irons v. Bedford-Stuyvesant Cmty. Legal Servs.*, No. 13-CV-4467 (MKB), 2015 WL 5692860, at *19 (E.D.N.Y. Sept. 28, 2015) ("[T]o show that she engaged in protected activity, a plaintiff must do more than simply report or pass along information about another employee's complaint; she must communicate *her own* opposition to, or criticism of, the challenged behavior."). Accordingly, Plaintiff's protected activity is limited to her March 2013 demand letter and the December 2013 filing of her EEOC complaint.[22]

---

[22] Though the Plaintiff does not specifically reference her February 2013 phone call to HR, the Court notes that this call, in which Plaintiff stated that "she is disabled and feels she is being discriminated against" (Pl.'s Ex. 37, Dkt. 77-28, at ECF 2) could also be used to argue that Plaintiff engaged in protected activity for which she was retaliated against, given that, within days of making the call, Plaintiff received both a negative performance evaluation and a second written warning (Defs.' 56.1, Dkt. 78-9, ¶¶ 43–44; Pl.'s Dep., Dkt. 78-3, at 152:9). However, the Court does not find that such a complaint rises to the level of protected activity because Plaintiff's vague statement that she felt discriminated against, without more, was insufficient to put Chase on notice that she was engaging in protected conduct under the ADA. *See Moore*, 2013 WL 3968748, at *17 ("[P]laintiff did not engage in protected activity where [s]he 'neither pointed out discrimination against particular individuals nor discriminatory practices by [the employer].'") (quoting *Manoharan v. Columbia Univ.*, 842 F.2d 590, 594 (2d Cir. 1988)). Furthermore, given that Plaintiff has not provided more details regarding this complaint in pursuing her claims or opposing Defendants' motion (Pl.'s Ex. 37, Dkt. 77-28, at ECF 2), the Court cannot determine whether she had a "good faith basis" for making her complaint especially since the call appeared to be related to the November 2012 incident with Maysonet, which did not involve any discrimination-related conduct, and because Plaintiff only stated that she *felt* she was being discriminated against. *See La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 212 (2d Cir. 2010) (summary order) ("It is well-established that a 'plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as [s]he can establish that [s]he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.'") (quoting *Treglia*, 313 F.3d at 719). Accordingly, the Court will not consider this February 2013 phone call in determining whether Plaintiff has stated a retaliation claim.

2.    Causal Connection

"A plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski*, 596 F.3d at 110 (internal quotations, alterations, and citation omitted). "There is no bright[ ]line rule for how long after a plaintiff has engaged in the protected activity that the adverse action must have occurred to benefit from the inference but generally courts measure the time in months." *Moore*, 2013 WL 3968748, at *19. Most courts in the Second Circuit have held that a lapse of time beyond two or three months will break the causal inference. *See Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 503–04 (S.D.N.Y. 2010) (collecting cases).

After Plaintiff provided a demand letter, through her attorneys, outlining her discrimination claims in March 2013, she received a negative performance evaluation in July 2013 (Defs.' 56.1, Dkt. 78-9, ¶ 50), five months later. Similarly, Plaintiff was terminated in November 2014 (*id.* ¶ 63), eleven months after filing her EEOC complaint in December 2013 (*id.* ¶ 70). Accordingly, given the length of time between Plaintiff's protected activities and ensuing adverse employment actions, the Court finds Plaintiff has not sufficiently demonstrated that there is a causal connection between the two. *See, e.g.*, *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (noting that periods of three and four months between protected activity and adverse employment action insufficient to establish causal connection).

## B.    Pretext

Even assuming *arguendo*, that Plaintiff is able to establish a *prima facie* case of retaliation, her claims nonetheless fail because she is unable to show that Defendants' legitimate, non-discriminatory reasons for the adverse employment actions are pretextual. "[D]uring the final

stage of the burden shifting framework, the plaintiff must show that retaliation was a but-for cause of the adverse employment action." *Moore*, 2013 WL 3968748, at *19; *Naumovski v. Norris*, 934 F.3d 200, 220 & n.77 (2d Cir. 2019) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action.")). "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Kwan v. Andalez Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). Plaintiff is unable to do so here.

As discussed *supra*, Defendants' have established a legitimate, non-retaliatory reason for Plaintiff's termination that Plaintiff is unable to rebut. Similarly, Defendants have provided legitimate, non-retaliatory reasons for Plaintiff's July 2013 negative performance evaluation. (*See* Defs.' 56.1, Dkt. 78-9, ¶ 49 (noting several non-discriminatory problems with Plaintiff's work performance between March and May 2013).) Plaintiff provides no evidence to suggest that this performance rating was pretextual, especially since it was not the first negative performance review that Plaintiff had received. *See Porter v. Potter*, 366 F. App'x 195, 197 (2d Cir. 2010) (summary order) ("Adverse employment actions that are part of an 'extensive period of progressive discipline' that begins prior to any protected activity on the plaintiff's part cannot give rise to an inference of retaliation . . . .") (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)). Mere temporal proximity at the pretext stage is not enough to save a retaliation claim. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal

proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext."). Therefore, the Court finds that Plaintiff has failed to meet her burden of providing sufficient evidence that, but for her protected activities, she would not have received a negative employment evaluation in July 2013 or have been terminated in November 2014. *See Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 257 (S.D.N.Y. 2015) (noting that "the plaintiffs did not meet their burden to establish pretext because, among other things, the plaintiffs' prima facie case was weak") (citing *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 103–04 (2d Cir. 2001)).

Accordingly, the Court finds that Plaintiff has failed to establish her claims of retaliation under Title VII, the ADA, and the ADEA, and grants summary judgment to Defendants on these claims.

## IV.  **State Law Clams**

Having disposed of Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's claims under New York state law. *See* 28 U.S.C. § 1367(c)(3).  Where "federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (internal citation omitted); *see also Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial the state claims should be dismissed as well.").  Accordingly, this Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, and dismisses them without prejudice, pursuant to 28 U.S.C. § 1367(c)(3).

## CONCLUSION

For the reasons stated, Defendants' motion for summary judgment is granted in its entirety. Plaintiff's federal claims against all Defendants are dismissed with prejudice while her state law claims are dismissed without prejudice. The Clerk of Court is respectfully directed to enter judgment and close this case accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 30, 2019
Brooklyn, New York